Se. Anesthesiology Consultants, PLLC v. Charlotte-Mecklenburg Hosp. Auth., 2018 NCBC 60.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 5899

SOUTHEAST ANESTHESIOLOGY
CONSULTANTS, PLLC; AMERICAN
ANESTHESIOLOGY OF THE
SOUTHEAST, PLLC; MEDNAX
SERVICES, INC.; and RUSSELL A.
SAUDER, M.D., M.B.A.,

Plaintiffs,

v.

THE CHARLOTTE-
MECKLENBURG HOSPITAL
AUTHORITY, d/b/a CAROLINAS
HEALTHCARE SYSTEM, and d/b/a
ATRIUM HEALTH; THOMAS M.
WHERRY, M.D.; TOTAL
ANESTHESIA SOLUTIONS, LLC;
and SCOPE ANESTHESIA OF
NORTH CAROLINA, PLLC,

Defendants.

**ORDER ON PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING
ORDER AND/OR PRELIMINARY
INJUNCTION**

1.     THIS MATTER is before the Court on Plaintiffs Southeast Anesthesiology Consultants, PLLC ("SEA"), American Anesthesiology of the Southeast, PLLC ("AASE"), and Mednax Services, Inc.'s ("Mednax") (collectively, "Plaintiffs")[1] Motion for Temporary Restraining Order and/or Preliminary Injunction (the "Motion"). (ECF No. 17.)   Having considered the Motion, affidavits, briefs in support of and in opposition to the Motion, and the arguments of counsel at a hearing on the Motion,

---

[1] Plaintiff Russell A. Sauder, M.D., M.B.A., does not join in the Motion because he is neither an owner of the alleged trade secrets and confidential information nor a party to the contracts that form the basis for the Motion.  (Mot. TRO and/or Prelim. Inj. 1 n.1, ECF No. 17 ["Pls.' Mot. Prelim. Inj."].)

the Court GRANTS in part and DENIES in part the Motion for the reasons stated herein.

## I.    PROCEDURAL HISTORY

2.    The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

3.    Plaintiffs instituted this action by filing a Complaint on March 26, 2018 asserting claims against Defendant Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System, and d/b/a Atrium Health ("Atrium") arising out of the award of exclusive contracts to provide anesthesia services at certain Atrium facilities to Defendant Scope Anesthesia of North Carolina, PLLC ("Scope").   (ECF No. 3.) Plaintiffs also assert claims against Scope's founder, Thomas M. Wherry, M.D. ("Wherry") and his consulting company, Total Anesthesia Solutions, LLC ("Total Anesthesia").   Wherry, Scope, and Total Anesthesia are referred to collectively herein as the "Wherry Defendants."

4.    On May 11, 2018, Plaintiffs publicly filed the Motion, (ECF No. 17), and the affidavit of William C. Buhrman, M.D. ("Buhrman"), Chief of Anesthesiology and Chief of Transplant Anesthesia at Atrium's Carolinas Medical Center Main ("CMC Main"), (ECF No. 21).  Plaintiffs also filed under seal a brief in support of the Motion, (ECF No. 18), along with the affidavits of Matthew J. Belan, M.D., M.B.A. ("Belan"), Mednax's Division Medical Officer for Anesthesiology and Adult Critical Care Services, (ECF No. 19); Michael Besedick ("Besedick"), Engagement Manager for Surgical Directions, a Mednax affiliate, (ECF No. 20); David R. Lebec, M.D. ("Lebec"),

Mednax's Division Medical Officer, (ECF No. 22); and Joshua S. Miller, M.D. ("Miller"), Mednax's Divisional Medical Officer for Anesthesiology, Critical Care, and Pain Management Services, (ECF No. 23). On May 18, 2018, Plaintiffs publicly filed redacted copies of these documents but requested that certain exhibits to the affidavits be kept entirely sealed. (ECF Nos. 35–37, 39–44.) On June 12, 2018, Plaintiffs filed additional copies of certain documents with more limited redactions.[2] (ECF Nos. 88.1–88.4.)

5. On May 15, 2018, following a phone conference with counsel for all parties, the Court issued an Order setting the Motion for hearing on Monday, June 18, 2018, allowing Defendants to file a brief in opposition to the Motion by May 30, 2018, and allowing Plaintiffs to file a reply brief by June 12, 2018. (ECF No. 31.)

6. On May 30, 2018, Atrium publicly filed the affidavit of Christopher Berger ("Berger"), Atrium's Assistant Vice President of Corporate Communications, (ECF No. 59), and filed under seal a response brief in opposition to the Motion, (ECF No. 46), along with the affidavits of Spencer Lilly ("Lilly"), President of Atrium's Central

---

[2] Under the General Rules of Practice and Procedure for the North Carolina Business Court ("BCR"), a party who believes that its court filings contain confidential or sensitive information may provisionally file documents under seal along with a motion for leave to file the documents under seal. BCR 5.2(a)–(b). Within five business days of filing documents provisionally under seal, the filing party must file public versions that bear redactions or, in rare circumstances, may file a notice that the entire document has been filed under seal. BCR 5.2(d). The Court will separately rule on whether the information provisionally filed under seal should remain under seal or be made public. Although court records are generally public records, "a trial court may, in the proper circumstances, shield portions of court proceedings and records from the public[.]" *Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 515 S.E.2d 675 (1999).

Division, (ECF No. 47); Michelle Fortune ("Fortune"), Vice President of Perioperative Services for Atrium's Metro Division, (ECF No. 56); and Diane Blanchfield ("Blanchfield"), Assistant Vice President of Anesthesia Services for Atrium's Metro Division, (ECF No. 57). On June 5, 2018, Atrium filed redacted copies of the documents provisionally filed under seal. (ECF Nos. 76.1–76.4.)

7. Also on May 30, 2018, the Wherry Defendants filed under seal a response brief in opposition to the Motion, (ECF No. 65), and the affidavit of Wherry, (ECF No. 66), and publicly filed the affidavits of Scope consultants Joe Tobin, M.D. ("Tobin"), (ECF No. 67), and Bill Greeley, M.D., M.B.A. ("Greeley"), (ECF No. 69). On June 6, 2018, the Wherry Defendants publicly filed unredacted copies of the documents previously filed under seal. (ECF No. 77.1–77.2.)

8. On June 12, 2018, Plaintiffs publicly filed a reply brief, (ECF No. 80), along with additional affidavits of W.M. Long, III, C.P.A. ("Long"), Mednax's Regional Vice President, (ECF No. 81), Jason A. Clemens, C.F.A., Chief Financial Officer for Mednax National Medical Group, (ECF No. 85), Lebec, (ECF No. 83), and Buhrman, (ECF No. 86). On June 14, 2018, Plaintiffs publicly filed Long's supplemental affidavit, correcting erroneous information in his original affidavit. (ECF No. 89.)

9. On June 18, 2018, the Court held a hearing on the Motion. Counsel for all parties were present and participated in the hearing.

10. Having considered the affidavits, briefs, arguments, and supporting materials presented to the Court, the Court makes the following findings of fact and conclusions of law for the limited purpose of resolving the Motion, without prejudice

to making contrary or different findings and conclusions in subsequent orders. *See Lohrmann v. Iredell Mem'l Hosp., Inc.*, 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005) ("It is well settled that findings of fact made during a preliminary injunction proceeding are not binding upon a court at a trial on the merits.").

## II.     FINDINGS OF FACT

### A.     The Parties

11.     SEA is a North Carolina professional limited liability company that employs approximately ninety anesthesiologists to provide anesthesia services to hospitals and medical facilities.  (Compl. ¶¶ 2, 11, ECF No. 3.)

12.     AASE is a North Carolina professional limited liability company that employs anesthesiologists whose services AASE contracts out to SEA to provide anesthesia services to medical facilities pursuant to contracts between SEA and the medical facilities.  (Compl. ¶¶ 2, 12.)

13.     Mednax is a Florida corporation engaged in physician practice management.  (Compl. ¶ 13.)  Since 2010, SEA has contracted with Mednax to provide administrative and management services such as billing, collections, and human resources.  (Compl. ¶ 22.)

14.     Atrium is a public non-profit hospital authority, organized as the Charlotte-Mecklenburg Hospital Authority pursuant to the North Carolina Hospital Authorities Act, with its principal place of business in Mecklenburg County.  (Compl. ¶ 15; Aff. Spencer Lilly ¶¶ 5, 9, ECF No. 76.2.)  Atrium did business as Carolinas

Healthcare System ("CHS") until it recently changed its name to Atrium. (Compl. ¶ 15; Lilly Aff. ¶ 5.)

15. Wherry is a board certified anesthesiologist licensed to practice in several states, including North Carolina, who has founded several anesthesia practice groups. (Aff. Thomas M. Wherry, M.D. ¶¶ 4–6, ECF No. 77.2.)

16. Total Anesthesia is a Maryland limited liability company that Wherry formed to provide consulting services for surgery centers and hospitals to help increase productivity, lower costs, and improve patient outcomes. (Compl. ¶ 19; Wherry Aff. ¶ 10.)

17. Scope is a North Carolina professional limited liability company that Wherry formed in early 2018 to provide qualified anesthesiologists and related services to North Carolina healthcare systems and entities. (Compl. ¶ 20; Aff. Joshua S. Miller, M.D. Ex. C, ECF No. 23.3.)

### B. Exclusive Service Agreements for Anesthesia Services

18. Atrium operates, manages, and is affiliated with numerous medical facilities, physician practices, and other healthcare services operations in Mecklenburg and surrounding counties. (Lilly Aff. ¶ 6.) To provide necessary anesthesia services to its patients, Atrium employs its own certified registered nurse anesthetists ("CRNAs") and enters exclusive service contracts with physician groups that provide qualified physician anesthesiologists to staff the various facilities. (Compl. ¶¶ 2, 21; Lilly Aff. ¶ 12.) Typically, each of the service contracts between Atrium and the physician groups are for a fixed term of between two and three years,

at the end of which, Atrium and the physician group in question negotiate whether to enter into a new contract or terminate the existing relationship. (Lilly Aff. ¶ 14.) Under the service contracts, the physician groups traditionally billed patients directly for anesthesia services provided at Atrium facilities. (Lilly Aff. ¶ 15.)

19. In 2013, Atrium began discussions with its anesthesia providers about shifting to a "physician-lease model." Under the physician-lease model, Atrium would bill patients for anesthesia services and would pay the physician group a certain amount for each physician needed to staff the facility or facilities covered by the agreement. (Lilly Aff. ¶¶ 15–16; *see also* Wherry Aff. ¶ 13, (explaining the physician-lease model); Aff. Joshua S. Miller, M.D. ¶¶ 24–25, ECF No. 23 (same).)

20. Since the 1980s, Atrium and SEA have contracted for SEA to be the exclusive anesthesia provider at certain Atrium facilities. (Compl. ¶ 2; Lilly Aff. ¶ 12.) Of relevance to the pending litigation, Atrium and SEA are currently parties to six separate contracts that grant SEA the exclusive right to provide anesthesia services at eight separate facilities owned and/or operated by Atrium: CMC Main, Carolinas Medical Center Mercy ("CMC Mercy"), Levine Children's Hospital ("Levine"), (collectively, the "CMC Facilities"), and CHS hospitals in Cleveland, Kings Mountain, Pineville, Lincoln, and Union (the "CHS Facilities").[3] (Compl. ¶ 15; Lilly

---

[3] The agreement for CHS Pineville is between SEA and Mercy Hospital, Inc., a subsidiary of Atrium. (Lilly Aff. ¶ 13 n.2.) Because the parties do not raise the issue of whether Atrium may be bound by a contract entered into by its subsidiary, the Court will treat all six contracts as though they were between SEA and Atrium.

Aff. ¶¶ 3, 6, 12–13.)  The CMC and CHS Facilities are referred to collectively herein as the "Atrium Facilities."

21. In 2014, while negotiating whether to enter new contracts with SEA, Atrium proposed a physician-lease model to SEA.  (Lilly Aff. ¶ 18.)  SEA initially refused to agree to the physician-lease model, causing Atrium to terminate its agreement with SEA for one Atrium facility not relevant to the Motion.  (Lilly Aff. ¶ 18.)  However, in negotiating new contracts in 2015 and 2016, SEA eventually agreed to the physician-lease model for five of its six contracts with Atrium, thereby transitioning all five of the CHS Facilities to a physician-lease model.  (Lilly Aff. ¶¶ 13, 19.)  The Court has only been provided with the agreement for CHS Union (the "Union Agreement"), but Plaintiffs' submissions suggest that the Union Agreement is representative of the agreements for the remaining four CHS Facilities.  (Miller Aff. ¶ 6–8, 31.)  The Union Agreement was for an initial two-year term from January 1, 2016 through December 31, 2017.  (Miller Aff. Ex. A, § 2.1, ECF No. 88.1 ["Union Agreement"].)

22. However, SEA would not agree to the physician-lease model as to the contract for the CMC Facilities.  As a result, Atrium entered a new contract with SEA under the traditional billing model (the "CMC Agreement").  (Lilly Aff. Ex. A, § 3.1(a) ["CMC Agreement"].)  The CMC Agreement's initial term was from October 1, 2014 through September 30, 2016.  (CMC Agreement § 2.1.)  On January 1, 2016, SEA and Atrium executed an amendment extending the CMC Agreement through December 31, 2017.  (First Amendment to CMC Agreement, § 2.1.)  At that time, Atrium made

clear that it would only enter into future contracts with SEA for the CMC Facilities under the physician-lease model. (Lilly Aff. ¶ 21.)

23. The CMC Agreement and all of the agreements for the CHS Facilities (collectively, the "SEA Agreements") prohibited the parties to the agreements from disclosing the other's confidential information except

> to those of its employees, agents, subcontractors, professional advisors and independent contractors who are required to know such information for purposes of enabling the disclosing party to perform its obligations to the other party or to pursue and evaluate the business relationship with the other party and only so long as each person to whom such disclosure is made will be informed of the disclosing party's obligations hereunder and agree to be bound by the confidentiality provisions hereof . . . .

(CMC Agreement § 4.8(a); Union Agreement § 4.8(a).) The SEA Agreements defined SEA's confidential information to include "any information of [SEA] that individually or as compiled constitutes confidential, proprietary or trade secret information developed by [SEA] and shall include, but not be limited to, patient medical and billing records and other patient information of patients of [SEA.]" (CMC Agreement § 4.8(a); Union Agreement § 4.8(a).) The SEA Agreements further provided that each party "shall have the right of injunctive relief or specific performance as a result of a breach of this section by the other" and that the confidentiality provision "shall survive the expiration or termination of this Agreement for any reason." (CMC Agreement § 4.8(c); Union Agreement § 4.8(c).)

24. The SEA Agreements also contained non-solicitation provisions. (Miller Aff. ¶ 31.) The Union Agreement provided that, "[d]uring the term of this Agreement and for a one (1) year period following the termination of this Agreement, [Atrium]

will not [s]olicit or employ any person then employed by [SEA] and [SEA] will not [s]olicit or employ any person then employed by [Atrium], without the prior written consent of the other party." (Union Agreement § 1.6(b).) The Union Agreement defined "solicit" to mean "actively encouraging a person who is known to be employed by the other party to quit their employment with the other party and accept employment with the soliciting party" and the non-solicitation provision applied to "a party, its owners and any of its management level representatives, or someone at their direction[.]" (Union Agreement § 1.6(b).)

### C.    Atrium Engaged Total Anesthesia as a Consultant

25.    In April 2017, as Atrium and SEA negotiated whether to enter new contracts for SEA to continue providing anesthesia services at the Atrium Facilities after the expiration of the existing agreements, Atrium engaged the consulting services of Defendants Total Anesthesia and Wherry. (Lilly Aff. ¶ 32; Wherry Aff. ¶ 15.) Atrium engaged Wherry to assist in evaluating the provision of anesthesia services at the Atrium Facilities, looking specifically at current staffing of CRNAs and physician anesthesiologists and at whether new procedures and changed roles between CRNAs and physicians could be implemented at the Atrium Facilities. (Lilly Aff. ¶¶ 34–35.) In mid-May 2017, Plaintiffs were informed that Wherry had been hired as a consultant. (Aff. Matthew J. Belan, M.D., M.B.A. ¶¶ 3–4, ECF No. 88.4; Aff. William C. Buhrman, M.D. ¶¶ 4–5, ECF No. 21; Aff. David R. Lebec, M.D. ¶¶ 3–4, ECF No. 88.2; Miller Aff. ¶¶ 4–5.)

26. To assist Wherry in conducting his analysis, Atrium provided Wherry with its clinical logs and third-party billing data for the CHS Facilities operating under the physician-lease model pursuant to which Atrium billed patients. (Wherry Aff. ¶ 16.) However, Plaintiffs refused to provide billing data for CMC Main and CMC Mercy—facilities that do not operate under a physician-lease model and at which Mednax billed patients directly for the SEA physicians' services. (Wherry Aff. ¶ 16.) Wherry also visited each location and interviewed certain Atrium personnel and SEA physicians. (Lilly Aff. ¶ 33; Wherry Aff. ¶¶ 16–17; Buhrman Aff. ¶ 5; Miller Aff. ¶ 10.)

27. Wherry individually interviewed SEA physicians, including Buhrman, Miller, Thomas Doolittle ("Doolittle"), and Brian May ("May"). (Miller Aff. ¶ 10.) Wherry testified by affidavit that he and SEA physicians "discussed the general types of cases they worked on and where their challenges lay." (Wherry Aff. ¶ 17.) Wherry avers that he learned nothing from the physician interviews that he could not or did not learn from reviewing Atrium's records and speaking with Atrium's staff, CRNAs, and surgeons. (Wherry Aff. ¶ 18.) No SEA physician ever indicated to Wherry that they were imparting confidential or trade secret information. (Wherry Aff. ¶ 18.)

28. Buhrman testified that, during a one-hour interview, Wherry asked detailed questions about the staffing model for Buhrman's department and was particularly interested in the role of CRNAs. (Buhrman Aff. ¶ 7.) Buhrman informed Wherry that "he could not use typical anesthesia practice data to prepare a staffing model" for the Atrium Facilities, which present "a much more challenging environment than in other anesthesia practices," in part, because at CMC Main

"specific surgeons . . . had particular requirements" and anesthesiologists "cared for the tertiary care patient population seen in an academic practice setting, but were required to work at a speed and efficiency usually seen in a private practice setting" without the benefit of additional resources enjoyed by teaching hospitals. (Buhrman Aff. ¶¶ 5–6.) Buhrman avers that he informed Wherry of "specific reasons" why SEA staffed some operating rooms ("ORs") at a higher-than-average ratio of physicians to ORs. (Buhrman Aff. ¶ 7.) Finally, Buhrman avers that, from the interview, Wherry "learned the 'recipe' for how we staff complex surgeries, such as transplants, for Atrium—including information he could not learn through public sources or Atrium's personnel." (Buhrman Aff. ¶ 8.)

29.     Miller avers that he met with Wherry but does not elaborate on what, if any, information he disclosed to Wherry. (Miller Aff. ¶ 10.) Both Buhrman and Miller aver that they, and other SEA physicians, shared information with Wherry on the understanding that he was a professional advisor hired by Atrium to evaluate the business relationship between SEA and Atrium. (Buhrman Aff. ¶ 20; Miller Aff. ¶ 9.)

30.     On August 22, 2017, Wherry reported the results of his analysis in a PowerPoint presentation (the "August Presentation") at a meeting attended by representatives of Atrium and Plaintiffs. (Lilly Aff. ¶ 37; Aff. Diane Blanchfield ¶ 8, ECF No. 76.4; Wherry Aff. ¶ 20; Miller Aff. ¶¶ 11–12.) In the August Presentation, Wherry outlined a staffing model based on the number of "full-time equivalent" ("FTE") physicians needed to staff each facility. (Wherry Aff. ¶ 21.) Wherry proposed that Atrium "increase[] ratios of CRNAs to [physicians] and expand[] 'practice and

responsibility' on the part of CRNAs." (Belan Aff. ¶ 6e; *see also* Lebec Aff. ¶ 6e.) The Court understands that, if implemented, Wherry's proposal would result in a material reduction in the number of physician anesthesiologists providing services at the Atrium Facilities. (*See* Aff. Christopher Berger Ex. F-4, at 32, 53, 70, 87, 108, 130, 154, ECF No. 60 (showing current FTE levels and Wherry's proposed cuts).)

31. Plaintiffs' personnel who either attended or had an opportunity to review Wherry's August Presentation perceived Wherry's projections and proposed staffing model to be so deeply flawed that they believed "Wherry was unable, even with the information provided to him by . . . SEA physicians . . . , to provide any detailed staffing analytics that could be used to predict future staffing needs with accuracy." (Belan Aff. ¶ 7.) Specifically, Plaintiffs took issue with Wherry's reliance on the average number of concurrent surgeries in multiple ORs at a specific hour of the day, without reference to the day of the week or the particular OR. (Belan Aff. ¶ 6a–c; Lebec Aff. ¶ 6a–c.) Plaintiffs also believed that Wherry, because he lacked Plaintiffs' years of experience at the Atrium Facilities, overestimated the ability of Atrium's CRNAs to administer more complex procedures without several years of training. (Belan Aff. ¶ 6e; Lebec Aff. ¶ 6e.)

32. Wherry also received criticism from Plaintiffs because he relied on data from 2016 in the August Presentation. Following the August Presentation, Wherry presented an updated and revised analysis on September 22, 2017 (the "September Presentation"). (Lilly Aff. ¶ 22; Wherry Aff. ¶ 22.) It is not clear who was in attendance at the September Presentation, but Plaintiffs' personnel received copies

of the updated PowerPoint slides.  (Belan Aff. ¶ 10; Lebec Aff. ¶ 8; Miller Aff. ¶ 13.) Plaintiffs did not believe that the September Presentation cured the defects they perceived in Wherry's analysis.  (Belan Aff. ¶ 8; Lebec Aff. ¶ 8; Miller Aff. ¶ 13.)

### D.      Continued Negotiations Between Atrium and Plaintiffs

33.    After viewing Wherry's presentations, Belan, Lebec, and other Mednax and SEA personnel decided to create a presentation to provide Atrium with their own staffing proposal based on Plaintiffs' projections of staffing needs at the Atrium Facilities.  (Belan Aff. ¶ 10; Lebec Aff. ¶ 10.)  In October, 2017, Plaintiffs proposed, as an alternative to the physician-lease model demanded by Atrium for the CMC Facilities, that Atrium enter an agreement for SEA to lease Atrium's CRNAs at the CMC Facilities (the "CRNA-lease proposal").  (Buhrman Aff. ¶ 11; Miller Aff. ¶ 15; Long Aff. ¶¶ 4–5; Lilly Aff. ¶ 43.)  Under a CRNA lease, the CRNAs would remain Atrium's employees, but Mednax would pay Atrium a set amount per CRNA and would, for the first time, become involved in CRNA management.  (Lilly Aff. ¶ 44.) Plaintiffs believed that a CRNA lease would result in considerable savings for Atrium.  (Buhrman Aff. ¶ 11; Miller Aff. ¶ 15; Long Aff. ¶ 4.)

34.    Atrium agreed to evaluate the CRNA-lease proposal, but reaffirmed its position that Atrium would only enter future contracts with SEA under the physician-lease model.  (Lilly Aff. ¶ 47.)  To that end, Lilly wrote Plaintiffs a letter proposing FTE numbers for the CHS Facilities already operating under a physician-lease model and that existing staff numbers at the CMC Facilities be used for a lease arrangement at those facilities.  (Lilly Aff. Ex. D.)

35. After it became clear that the parties would not reach agreement on new contracts before the existing agreements expired on December 31, 2017, the parties began discussing short-term extensions of the SEA Agreements in early November. (Lilly Aff. ¶ 49.) Plaintiffs and Atrium ultimately agreed to extend the SEA Agreements through June 30, 2018. (Lilly Aff. ¶ 51.) As part of the extensions, which became effective January 1, 2018, Atrium agreed that for the first three months of the extensions, Atrium would not "enter into negotiations with anesthesiologists or anesthesiology groups or practices, relating or otherwise pertaining to the provision of professional anesthesiology services to or on behalf of" the Atrium Facilities (the "No-Shop Provision"). (Lilly Aff. Ex. E, § 2.3, Ex. F, at 1.) The extensions were signed on behalf of SEA on November 20, 2017 and were delivered to Atrium on November 28, 2017. (Lilly Aff. ¶ 51, Exs. E–F; Long Aff. Ex. C, ECF No. 82.3.) By their express terms, the extensions became effective on January 1, 2018. As a result, Atrium was not prohibited from negotiating and entering an agreement with a third party to provide anesthesia services prior to January 1, 2018.

### E. Plaintiffs' CRNA-Lease Proposal

36. To create the CRNA-lease proposal, Plaintiffs employed two proprietary software tools (the "Staffing Applications") to calculate actual OR utilization, workforce productivity, and staffing demands in order to predict future needs. (Belan Aff. ¶ 11; Lebec Aff. ¶ 9.) The Staffing Applications consist of the "Rooms Running" algorithm and the "Staffing Calculator." (Belan Aff. ¶ 10.)

37.     Rooms Running consists of software designed in late 2015 by Besedick, an engagement manager for Mednax affiliate Surgical Directions.  (Besedick Aff. ¶ 5.)  In 2017, Besedick refined the Staffing Applications and customized them for use with Plaintiffs' anesthesiology practices.  (Belan Aff. ¶¶ 10–11; Besedick Aff. ¶¶ 2, 10.)  Besedick spent several months and hundreds of hours developing the design and coding of Rooms Running.  (Besedick Aff. ¶ 8.)

38.     Rooms Running processes Plaintiffs' historical data and generates "probabilities of concurrently running ORs for a given day of the week and time of day . . . that can be placed into visualization tools (such as pivot tables, charts, or graphs)."  (Besedick Aff. ¶ 12.)  Besedick could then format the data generated by Rooms Running into "heatmaps," a term commonly used in the staffing industry to describe times when a workplace is busier or slower than other times.  (Besedick Aff. ¶ 13; Belan Aff. ¶ 6; Lebec Aff. ¶ 6.)

39.     The heatmaps provided probabilities for the number of patients in progress in a particular OR at any given hour of the day for each day of the week.  (Besedick Aff. ¶ 13.)  These heatmaps could then be used to determine, within a certain probability, how many providers are needed to staff a particular OR.  (Besedick Aff. ¶¶ 13–14.)  According to Besedick, the heatmaps predict the staffing needs for Atrium's ORs at more than 95% accuracy.  (Besedick Aff. ¶ 14.)

40.     The information generated by Rooms Running was then processed through Plaintiffs' Staffing Calculator, an application that uses proprietary formulas created by Belan and Lebec.  (Belan Aff. ¶ 13a; Lebec Aff. ¶ 13.)  The Staffing Calculator

applies limitations, such as required physician-to-CRNA ratios, vacations for personnel, or other idiosyncrasies of particular anesthesia locations, to the outputs generated by Rooms Running to convert the heatmaps into staffing models and proposals. (Belan Aff. ¶ 13; Lebec Aff. ¶ 13.)

41. The Rooms Running software exists on only four encrypted laptop computers in Besedick's department at Surgical Directions and only four people at Surgical Directions have access to the software code. (Besedick Aff. ¶ 19.) All Surgical Directions personnel are subject to confidentiality agreements and must have an identification badge to enter the building. (Besedick Aff. ¶ 19.) Recipients of Plaintiffs' heatmaps do not receive the code used to generate the outputs and the algorithm is not shared outside of Surgical Directions. (Besedick Aff. ¶ 19.) The "'manipulable' or 'live' form of the Staffing Calculator formulas or their outputs" is not released to anyone outside of Mednax or SEA. (Belan Aff. ¶ 13c; Lebec Aff. ¶ 14.)

42. Outside of Plaintiffs' business, the Staffing Applications are shared only with hospitals at which Plaintiffs provide anesthesia services and that are subject to confidentiality agreements. (Belan Aff. ¶ 13c; Lebec Aff. ¶ 14.) Within Plaintiffs' business, the Staffing Applications are shared only with personnel with "an operational need to view the material." (Belan Aff. ¶ 13c; Lebec Aff. ¶ 14.)

43. Plaintiffs used the Staffing Applications to create heatmaps, graphs, tables, shift staffing and FTE models, conclusive narratives, and slides (the "Staffing Formula Outputs" or "Outputs") to generate a CRNA-lease proposal intended as a staffing counter proposal to Wherry's August and September Presentations. (Miller

Aff. ¶ 14; Belan Aff. ¶¶ 14, 16; Lebec Aff. Ex. C, at 1, 21, ECF No 88.3.) Plaintiffs requested a meeting with Atrium in order to present the proposal, and the parties ultimately agreed that Atrium's and Wherry's schedules would permit them to be present on November 30, 2017 to hear Plaintiffs' proposal. (Lilly Aff. ¶ 52; Suppl. Aff. W.M. Long, III, C.P.A. Ex. A, ECF No. 89.1.)

44. In advance of the scheduled presentation, representatives of Plaintiffs and Atrium attended a meeting on November 28, 2017, at which Plaintiffs made clear that under no circumstances would they agree to operate under a physician-lease model at the CMC Facilities—a contract term that Atrium previously advised Plaintiffs was absolutely necessary for a continued contractual relationship. (Lilly Aff. ¶ 53.)

45. Two days later, on November 30, 2017, Doolittle and Buhrman presented Plaintiffs' CRNA-lease proposal using a PowerPoint presentation at a meeting attended by Wherry and representatives of both Atrium and Plaintiffs (the "November 30 Presentation"). (Lilly Aff. ¶ 56; Buhrman Aff. ¶ 11; Lebec Aff. ¶¶ 15–17.) The presentation was not marked as confidential or as containing trade secret information and none of Plaintiffs' representatives gave any indication that the information contained therein was confidential or trade secret information. (Lilly Aff. ¶¶ 65–67; Aff. Michelle Fortune ¶¶ 31–33, ECF No. 76.3; Blanchfield Aff ¶ 11.) The November 30 Presentation did not include any software code or information about the operation of the Staffing Applications. (Fortune Aff. ¶ 28; Wherry Aff. ¶ 26.)

Therefore, no one associated with Defendants gained access to or knowledge about the computer code or formulas used to create or operate the Staffing Applications.

46. The proposal contained Plaintiffs' Staffing Formula Outputs in the form of heatmaps and staffing proposals for the CMC Facilities only for Monday and Thursday. (Belan Aff. ¶ 16; Lebec Aff. ¶ 17; *see also* Lebec Aff. Ex. C, at 6–9, 14–17 (certain portions remain under seal).) It also contained a critique of Wherry's August and September Presentations. (Lilly Aff. ¶ 56.) During the presentation, Fortune asked Burhman and Doolittle specific questions about how Plaintiffs would implement the CRNA-lease proposal and she was not satisfied with the presenters' responses. (Fortune Aff. ¶ 17.) Wherry took notes during the presentation, but avers that he did not keep his notes after checking Plaintiffs' criticism of his presentations against his own work. (Wherry Aff. ¶ 27.) Atrium's personnel averred that they did not consider Plaintiffs' proposal to be a realistic alternative to a physician lease. (Fortune Aff. ¶¶ 17–20; Blanchfield Aff. ¶ 12; Lilly Aff. ¶¶ 59–60, 62–64, 69.)

47. Later in the afternoon of November 30, 2017, a Mednax employee e-mailed the PowerPoint to Atrium personnel without indicating that the slides contained confidential or trade secret information or requesting that Atrium not distribute the information to any third party. (Lilly Aff. Ex. G.) The attached PowerPoint was forwarded to Wherry. (Wherry Aff. ¶ 28.)

F. **Atrium Contract with Scope**

48. Immediately after the November 30 Presentation, Wherry met with Lilly and Fortune. (Wherry Aff. ¶ 29.) Wherry avers that Lilly and Fortune indicated that,

because Plaintiffs would not accept any of Atrium's requested changes to the relationship, Atrium would need to consider alternative anesthesia providers and inquired as to whether Wherry would be interested in forming a North Carolina anesthesiology practice to become the exclusive provider of anesthesia services at the Atrium Facilities. (Wherry Aff. ¶ 29; Lilly Aff. ¶ 70.)

49. Wherry ultimately decided that he would be interested in contracting with Atrium to provide anesthesia services and, on December 28, 2017, Atrium and Wherry entered into an agreement for Wherry to form a physician practice to take over anesthesia services at the Atrium Facilities beginning on July 1, 2018 (the "Scope Agreement"). (Wherry Aff. ¶¶ 30–31; Lilly Aff. ¶¶ 71–72.) On January 5, 2018, articles of organization for Scope were field with the North Carolina Secretary of State listing Wherry as a member and organizer of Scope. (Miller Aff. Ex. C.)

50. Notwithstanding Atrium's negotiations with Wherry and the execution of the Scope Agreement, on December 13, 2017, Atrium sent Plaintiffs information that they had earlier requested to enable Plaintiffs to give a financial proposal to accompany the CRNA-lease proposal. (Long Aff. ¶¶ 5–6.)

51. Prior to execution of the Scope Agreement, Plaintiffs and Atrium planned a meeting for January 15, 2018 to continue negotiations. (Long Aff. ¶ 16; Lilly Aff. ¶ 73.) However, at the January 15 meeting, instead of engaging in further negotiations, Atrium informed Plaintiffs that Atrium would not enter into new agreements with SEA and the SEA Agreements and the relationship between Atrium

and SEA would terminate on July 1, 2018. (Lilly Aff. ¶ 73; Miller Aff. Ex. B, ECF No. 23.2; Long Aff. Ex. C.)

52. Plaintiffs' personnel aver that, although they were repeatedly told that Wherry was a consultant hired by Atrium to evaluate anesthesia services, it was not until February 1, 2018 that Plaintiffs first learned that Wherry had formed a competing anesthesiology practice that had been awarded the contracts for the Atrium Facilities. (Belan Aff. ¶ 26; Buhrman Aff. ¶ 20; Lebec Aff. ¶ 34; Miller Aff. ¶¶ 5, 20, Ex. B.)

### G. Solicitation of Physicians

53. On January 15, 2018, Atrium sent an internal memorandum to its medical staff and SEA physicians stating that the SEA Agreements would terminate July 1, 2018. (Miller Aff. Ex. G, ECF No. 23.7; Buhrman Aff. ¶ 12.) The memo admonished Atrium's personnel that, "[w]hile [Atrium] strongly desire[s] to retain the services of current SEA physicians[,] it is important that all [Atrium] teammates refrain from taking any action which could be deemed as soliciting SEA physicians for employment or services" and not to "engage in any discussions about this subject with anyone[.]" (Miller Aff. Ex. G, at 1.)

54. On March 21, 2018, Atrium again issued an internal memorandum stating that Atrium "highly values and respects the anesthesiologists currently practicing at Atrium" and would prefer "that there are no changes in our anesthesiology providers." (Miller Aff. Ex. Ex. G, at 3.) The second memoranda also emphasized that SEA was

free to permit the physicians to continue working for Atrium, but that it was a decision solely for SEA to make. (Miller Aff. Ex. G, at 3.)

55. After it became known that the SEA Agreements would terminate, Blanchfield and Buhrman had several conversations about the termination of the SEA Agreements. (Buhrman Aff. ¶ 13; Fortune Aff. ¶ 19.) On April 2, 2018, Blanchfield texted Buhrman to ask if he could speak with her, after which the two exchanged a string of text messages. (Reply Aff. William C. Buhrman, M.C. Ex. A, ECF No. 86.1.) Buhrman and Blanchfield contest both the content of and who initiated the conversations, however Blanchfield and Buhrman indisputably discussed the possibility that Buhrman could join Scope and continue to provide anesthesiology services at Atrium. (Buhrman Aff. ¶ 13; Blanchfield Aff. ¶¶ 20–21, 27; Buhrman Reply Aff. ¶¶ 2–3, ECF No. 86; Buhrman Reply Aff. Ex. A.)

56. As a result of their conversations, Blanchfield helped to set up communications between Wherry and Buhrman. (Long Aff. Ex. C, at 2.) Buhrman avers that he received a telephone call from Wherry on April 13, 2018, in which Wherry asked Buhrman to join Scope. (Buhrman Aff. ¶ 14.) Buhrman avers that Wherry informed Buhrman that he intended to challenge the non-compete restrictions in the SEA physicians' agreements with AASE and offered to cover Buhrman's legal expenses if Buhrman joined in the challenge. (Buhrman Aff. ¶ 14.) Buhrman also asserts that, on May 1, 2018, Wherry contacted him to inform him that Wherry could not make a job offer to Buhrman directly because it "would be 'illegal,'" but that he wanted to set up communications between Wherry's and Buhrman's

lawyers for that purpose. (Buhrman Aff. ¶ 16.) The following day, an attorney who Buhrman had earlier consulted called Buhrman and relayed the details of an employment offer to work for Scope. (Buhrman Aff. ¶ 17.)

57. Wherry does not rebut the assertions in Buhrman's affidavit, but instead avers that Scope has no outstanding offers of employment with any SEA physicians and has no intention to hire any SEA physicians. (Wherry Aff. ¶ 39.) Wherry further stated that in preparation to fulfill the Scope Agreement, he has recruited and hired at least sixty anesthesiologists who will move, or are already in the process of moving, to the Charlotte area. (Wherry Aff. ¶ 38.) At the hearing, counsel for the Wherry Defendants represented that Wherry had, by that date, recruited six additional full time physicians to work under the Scope Agreements and four *locum tenens* physicians to work at the Atrium Facilities on a temporary basis, for a total of seventy physician anesthesiologists who would be prepared to render anesthesia services at the Atrium Facilities beginning on July 1.

### H. Plaintiffs' Ad Campaign

58. After Atrium notified Plaintiffs that it would not enter into new agreements with SEA, Plaintiffs began sending communications to Atrium personnel and commenced a public advertising campaign (the "ad campaign") criticizing Atrium's decision to terminate the SEA Agreements and award the anesthesia contracts to Scope. (Aff. Christopher Berger ¶¶ 5–7, ECF No. 59.) Plaintiffs' ad campaign included full-page newspaper ads, billboards, dramatic radio ads, and online advertisements targeted at the Charlotte area. (Berger Aff. ¶ 7; Berger Aff. Exs. A–

C, E; Berger Aff. Ex. D, ECF No. 75.) Plaintiffs also established a website, www.yourcriticalmoment.com, to facilitate its ad campaign. (Berger Aff. ¶ 13, Exs. E–G.)

59. The ads emphasize that "[o]n July 1, 2018, surgeons in Atrium facilities will be paired with an entirely new group of anesthesiologists they have never worked with before[,]" and implore the public not to "let anyone play games with your health." (Berger Aff. Ex. B-2.) Plaintiffs published one ad in a Charlotte newspaper stating that, "[c]onglomerate hospital behemoths, like . . . Atrium . . can have unhealthy consequences for communities" and that Atrium's planned changes for anesthesia services "could seriously jeopardize patient safety." (Berger Aff. Ex. B-2.) Other ads stated: "Do you really want to play the odds?" and, "If you have surgery scheduled on or after July 1, you might want to scope out the details of the changes that Atrium health is making in anesthesiology care." (Berger Aff. Exs. B-2, F-1.)

60. Defendants perceived Plaintiffs' ad campaign as communicating false and misleading messages intended to foster fear among Atrium's patients and discredit Atrium's decision to terminate the SEA Agreements and select Scope as its new anesthesia provider. (Berger Aff. Ex. H-1.) In response to the ad campaign, Atrium published its own advertisements to dispel what it considered to be falsehoods in Plaintiffs' ads. (Berger Aff. ¶ 17, Ex. H-1.) As part of its response campaign, Atrium issued an open letter to the community stating that Plaintiffs, because they lost the SEA Agreements, engaged in an "unethical fear-based smear campaign, spreading false and misleading information about Atrium." (Berger Aff. Ex. H-1.) The letter

further called Mednax "a desperate company willing to trample medical ethics and standards of conduct . . . simply to leverage a business deal for its shareholders." (Berger Aff. Ex. H-1.)

### III.   CONCLUSIONS OF LAW

61.   Under Rule 65 of the North Carolina Rules of Civil Procedure ("Rule(s)"), the Court has discretion to issue a preliminary injunction or a temporary restraining order ("TRO") in appropriate circumstances.  *See* N.C. Gen. Stat. § 1A-1, Rule 65(a)– (b) cmt.  Although Rule 65 distinguishes between a TRO and a preliminary injunction, and allows for a TRO to be entered without notice to the opposing party, they both serve to preserve the *status quo* between the parties.  *See Lambe v. Smith*, 11 N.C. App. 580, 582, 182 S.E.2d 783, 784 (1971); *see also A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) ("The purpose of a preliminary injunction is ordinarily to preserve the *status quo* pending trial on the merits."); *Nat'l Surgery Ctr. Holdings, Inc. v. Surgical Inst. of Viewmont, LLC*, 2016 NCBC LEXIS 41, at *7 (N.C. Super. Ct. May 12, 2016) ("The purpose of a TRO is to preserve the status quo between the parties until such time as a motion for preliminary injunction can be properly heard.").  Thus, "a [TRO] is a 'drastic' procedure that 'operates within an emergency context which recognizes the need for swift action. . . .'" *RCR Enters., LLC v. McCall*, 2014 NCBC LEXIS 69, at *8 (N.C. Super. Ct. Dec. 19, 2014) (quoting *State ex rel. Gilchrist v. Hurley*, 48 N.C. App. 433, 448, 269 S.E.2d 646, 655 (1980)).  For either a TRO or a preliminary injunction, "[i]ts issuance is a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *Id.*

(citation omitted); *Nat'l Surgery Ctr. Holdings, Inc.*, 2016 NCBC LEXIS 41, at *7. Because Defendants have been provided an opportunity to submit counter affidavits and memoranda of law, the Court considers the Motion as a motion for preliminary injunction and not one for a TRO.

62. A preliminary injunction is appropriate only where a plaintiff is able to show: (1) a likelihood of success on the merits of its case and (2) that it is likely to sustain irreparable loss in the absence of an injunction, "or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *A.E.P. Indus., Inc.*, 308 N.C. at 401, 302 S.E.2d at 759–60 (emphasis omitted). Thus, Plaintiffs must demonstrate a "reasonable likelihood" of success on the merits of their claims to satisfy the first requirement. *Id.* at 403, 302 S.E.2d at 761. As to the second requirement, "[a] plaintiff is entitled to injunctive relief when there is no adequate remedy at law and irreparable harm will result if the injunction is not granted." *Vest v. Easley*, 145 N.C. App. 70, 76, 549 S.E.2d 568, 574 (2001). A party may show that it will suffer an irreparable injury for which it has no adequate remedy at law where damages are difficult to calculate and cannot be ascertained with certainty. *A.E.P. Indus., Inc.*, 308 N.C. at 406–07, 302 S.E.2d at 762.

63. "North Carolina courts have held that in assessing the TRO or preliminary injunction factors, the trial judge 'should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted.'" *Nat'l Surgery Ctr. Holdings, Inc.*, 2016 NCBC LEXIS 41, at *8 (quoting *Williams v. Greene*, 36 N.C. App. 80, 86,

243 S.E.2d 156, 160 (1978)).  A court should not enter a preliminary injunction if "there is a serious question as to the right of the defendant to engage in the activity" and forbidding the defendant to do so during the pendency of the litigation "would cause the defendant greater damage than the plaintiff would sustain from the continuance of the activity while the litigation is pending." *Bd. of Provincial Elders v. Jones*, 273 N.C. 174, 182, 159 S.E.2d 545, 551–52 (1968).

64.    The Court considers here whether Plaintiffs have demonstrated a likelihood of success only as to those claim for which they offered arguments in their briefs.[4]  The Court has carefully weighed the factual averments made by Plaintiffs and Defendants and the records and documents provided to the Court and, in summary, concludes that, although Plaintiffs have not demonstrated a likelihood of success as to their claim for misappropriation of trade secrets sufficient to warrant the grant of preliminary injunctive relief, Plaintiffs have demonstrated that a preliminary injunction should issue as to their claim that Atrium, acting in concert with Wherry, violated the non-solicitation provisions of the SEA Agreements.

---

[4] Although Plaintiffs presented arguments in their briefs and at the hearing that enjoining Atrium's alleged antitrust violations in in the public interest, (Pls.' Br. Supp. Mot. TRO and/or Prelim. Inj. 19–20, ECF No. 35 ["Pls.' Br. Supp."]; Pls.' Reply Br. Supp. Mot. TRO and/or Prelim. Inj. 11–12, ECF No. 80 ["Pls.' Reply Br."]), and argued for the first time at the hearing that Defendants' alleged breach of the duty of good faith and fair dealing bolsters Plaintiffs' arguments as to trade secret misappropriation, Plaintiffs have not argued in their briefs that they are likely to succeed on the merits of their antitrust or duty of good faith and fair dealing claims. Therefore, the Court will not address these claims as separate bases for injunctive relief.

## A. Misappropriation of Trade Secrets

65. Plaintiffs argue that the information that Plaintiffs' physicians conveyed to Wherry (the "Physician Interview Information") and the Staffing Formula Outputs contained in the November 30 Presentation constitute trade secrets. (Pls.' Br. Supp. 11–13.) Plaintiffs further argue that they are likely to succeed on the merits of their misappropriation of trade secrets claim because Defendants wrongfully obtained Plaintiffs' trade secrets under false pretenses to enable Scope to use Plaintiffs' information to become the exclusive provider of anesthesia services at the Atrium Facilities. (Pls.' Br. Supp. 9, 12.)

### A. Trade Secret Information

66. "The threshold question in any misappropriation of trade secrets case is whether the information obtained constitutes a trade secret . . . ." *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 369, 555 S.E.2d 634, 639 (2001). The North Carolina Trade Secrets Protection Act ("TSPA") defines a trade secret as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3). In determining whether information is a trade secret, North Carolina courts consider six factors:

(1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others."

*Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 567–68, 754 S.E.2d 852, 858 (2014). This Court has explained that, "[t]he factors overlap, and courts considering these factors do not always examine them separately and individually." *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 23, at \*15 (N.C. Super. Ct. Mar. 15, 2017) (alteration in original).

67.    Additionally, "[a] complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is 'insufficient to state a claim for misappropriation of trade secrets.'" *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 327, 660 S.E.2d 577, 585–86 (2008). "[A] plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004). "[F]or example, allegations that [a defendant] 'acquired knowledge of [the plaintiff's] business methods; clients, their specific requirements and needs; and other confidential information pertaining to [the plaintiff's] business' are too 'broad and vague' to allege a TSPA claim." *Horner Int'l Co.*, 232 N.C. App. at 568, 754 S.E.2d at 859 (quoting *Washburn*, 190 N.C. App. at 327, 660 S.E.2d at 586).

68. Defendants contend that Plaintiffs are not entitled to a preliminary injunction because Plaintiffs have failed to demonstrate that the information disclosed to Defendants constitutes protectable trade secrets. (Atrium's Br. Opp'n Pls.' Mot. TRO and/or Prelim. Inj. 6, ECF No. 76.1 ["Atrium's Br. Opp'n"]; Br. Opp'n Pls.' Mot. for TRO and/or Prelim. Inj. of Wherry Defs. 10, ECF No. 77.1 ["Wherry Defs.' Br. Opp'n"].)

69. Because Plaintiffs contend that two categories of information constitute trade secrets—the Physician Interview Information and the Staffing Formula Outputs—the Court will address each category in turn.

### a. Physician Interview Information

70. Plaintiffs allege that SEA permitted Wherry to personally interview several SEA physicians, thus allowing him to learn "all of the key trade secret and confidential business planning, scheduling methodologies, and staffing modeling information" necessary to provide anesthesia services at the Atrium Facilities. (Compl. ¶ 37.) Plaintiffs argue that the Physician Interview Information contains trade secrets because the information: (1) was not publicly available from other sources, (2) was shared in reliance on the SEA Agreements' confidentiality provisions, (3) is valuable because it enabled Wherry to offer efficient and accurate staffing models, and (4) took years of experience at Atrium to acquire. (Pls.' Br. Supp. 12–13.)

71. The Wherry Defendants contend that the Physician Interview Information does not contain trade secrets because Plaintiffs do not identify any trade secret information with particularity and, what little information is identified, is too vague

and subjective to constitute protectable information. (Wherry Defs.' Br. Opp'n 10–12.)

72. Plaintiffs' submissions identify the following as Physician Interview Information: the Atrium Facilities present challenging staffing issues, (Buhrman Aff. ¶ 6); certain surgeons at CMC Main have particular requirements, (Buhrman Aff. ¶ 6); CMC Main cares for a patient population usually seen in a teaching hospital but does not have the same resources as a teaching hospital, (Buhrman Aff. ¶ 6); "specific reasons" why SEA staffs some ORs with a higher-than-average ratio of physicians, (Buhrman Aff. ¶ 7); and the "recipe" for staffing complex surgeries, (Buhrman Aff. ¶ 8).

73. After reviewing Plaintiffs' submissions in support of the Motion, the Court concludes that, at this stage of the proceedings and based on the record before the Court, Plaintiffs have not demonstrated that the Physician Interview Information is entitled to trade secret protection. The particular staffing challenges of Atrium, requirements of certain Atrium-employed surgeons, the patient population and resources of Atrium, "specific reasons" for staffing ratios, and the staffing "recipe" have not been sufficiently described or identified to provide Defendants with notice of what they are accused of misappropriating or for the Court to determine whether the information constitutes protectable trade secrets. *Horner Int'l Co.*, 232 N.C. App. at 568, 754 S.E.2d at 859. Further, much of this information would have been known to Atrium's surgeons, CRNAs, and other staff who, like SEA's physicians, also have years of experience working in the Atrium Facilities. *Krawiec v. Manly*, 811 S.E.2d

542, 549 (N.C. 2018) (concluding that plaintiffs did not properly identify customer lists as trade secrets where plaintiffs failed to allege "that the lists contained any information that would not be readily accessible to defendants"); *Building Ctr., Inc. v. Carter Lumber of the N., Inc.*, 2017 NCBC LEXIS 85, at \*20 (N.C. Super. Ct. Sept. 21, 2017) (concluding that information that was easily accessible through readily available sources is not a trade secret).

74. Accordingly, the Court concludes, at this stage of proceedings and on the record before it, that Plaintiffs have not sufficiently identified the alleged trade secrets in the Physician Interview Information or that any such information consists of protectable trade secrets. Therefore, to the extent Plaintiffs' claim is based on the Physician Interview Information, the Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits.

#### b. Staffing Formula Outputs

75. The Complaint does not specifically mention the November 30 Presentation, but instead alleges that "[o]n November 30, 2017, Plaintiffs met with Lilly and offered, among other things, to lease [Atrium]-employed CRNAs" instead of adopting the physician-lease model. (Compl. ¶ 45.) Nevertheless, Plaintiffs argue that the November 30 Presentation contained Plaintiffs' Staffing Formula Outputs, which Plaintiffs contend are trade secrets that Defendants wrongfully obtained to enable Wherry to take over the exclusive service contracts for the Atrium Facilities. (Pls.' Br. Supp. 5, 11.)

76. Defendants argue that, while Plaintiffs' Staffing Applications and their formulas and codes may constitute trade secrets, there is no allegation Defendants ever received this information. (Atrium's Br. Opp'n 12; Wherry Defs.' Br. Opp'n 7.) Conversely, Defendants contend that the Staffing Formula Outputs that Defendants received from Plaintiffs do not constitute trade secrets because (1) they are of no value to Defendants, (2) Defendants, having access to the information used to generate the outputs, could have arrived at similar results on their own, and (3) the Outputs were not subject to reasonable efforts to guard their secrecy. (Atrium's Br. Opp'n 6; Wherry Defs.' Br. Opp'n 12.)

### (1) Value of Plaintiffs' Staffing Formula Outputs

77. Defendants first argue that the Staffing Formula Outputs are of no commercial value to them because they relate solely to CRNA staffing. (Atrium's Br. Opp'n 7–8; Wherry Defs.' Br. Opp'n 12–13.) Atrium argues that it rejected Plaintiffs' CRNA-lease proposal and, therefore, the information is of no value to anyone. (Atrium's Br. Opp'n 7.) The Wherry Defendants argue that the Staffing Formula Outputs are of no value to them as they will have no role in staffing CRNAs at the Atrium Facilities. (Wherry Defs.' Br. Opp'n 13.)

78. Plaintiffs counter that, because physicians and CRNAs must be staffed in certain ratios, Defendants, being in possession of Plaintiffs' CRNA staffing model, can work backwards mathematically to arrive at a physician staffing model. (Pls.' Reply Br. 2.) In support of this position, Lebec averred that Wherry's September Presentation bears this out because he used calculations of physician-to-CRNA ratios

to determine his proposals for reductions in the number of FTE physicians at each anesthesia location. (Reply Aff. David R. Lebec, M.D. ¶ 3, ECF No. 83.)

79. Assuming Plaintiffs are correct that staffing for physicians can be arrived at based on Plaintiffs' proposed CRNA staffing model, Plaintiffs' argument ignores the fact that Atrium engaged Wherry as a consultant to investigate ways to reduce the number of physicians required to staff the Atrium Facilities. (Lilly Aff. ¶¶ 34–35; Wherry Aff. ¶ 21; Miller Aff. ¶ 12.) The Court understands Plaintiffs' CRNA-lease proposal to recommend that Atrium expand the role of physicians and reduce the number of CRNAs required to staff the Atrium Facilities. (Lebec Aff. Ex. C, at 3 (proposing to "expand [a]nesthesiologists [sic] roles to facilitate more efficient CRNA staffing in complex cases and decreased CRNA float positions"); Lilly Aff. ¶¶ 61–62; Blanchfield Aff. ¶ 12.) Accordingly, even if Defendants used Plaintiffs' CRNA staffing model to determine physician staffing levels, the result would be contrary to Atrium's desired staffing model.

80. Defendants also argue that Plaintiffs' Staffing Formula Outputs are valueless because they are based on outdated information and only provide staffing proposals for twelve-hours a day for two days of the week. (Atrium's Br. Opp'n 12; Wherry Defs.' Br. Opp'n 13.) Plaintiffs argue that the Staffing Formula Outputs are not stale or unusable because Plaintiffs' November 30 Presentation contained a CRNA staffing proposal that was to be implemented in July 2018. (Pls.' Reply Br. 7.) Plaintiffs further argue that "[t]he November 30 Presentation contained the *entirety* of a functioning staffing model," and only lacked financial details. (Pls.' Reply Br. 6.)

Lebec averred that Defendants falsely asserted that the proposal was incomplete, reasoning that "[b]ecause surgical and anesthesia needs are substantially lower during the late afternoon and evening hours, these periods are usually staffed with a 'set' number of 'late/on-call' *physicians*[,]" not CRNAs." (Lebec Reply Aff. ¶ 4.)

81. The Court notes that, even if Plaintiffs' model was not based on current or time-relevant information, that fact would not necessarily foreclose the possibility of trade secret protection. This Court has previously rejected a similar argument as to whether plaintiff's compilation of historical customer pricing was stale, noting that "if historical information enhances 'the ability to predict a competitor's bid with reasonable accuracy,' it may have commercial value." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *26 (N.C. Super. Ct. Apr. 23, 2015). Similarly, if past staffing projections could assist in evaluating future needs, such information could be of value to Defendants.

82. Nevertheless, the Court is constrained to conclude that Plaintiffs have not made a sufficient showing, at this stage of the proceedings, for the Court to determine that the Staffing Formula Outputs are complete enough to be commercially valuable to Defendants. Although Lebec offers an explanation for why Plaintiffs' CRNA-lease proposal only accounts for twelve hours of the day, Plaintiffs nowhere address how a CRNA-staffing proposal for only two weekdays constitutes "the entirety of a functioning staffing model." Indeed, Plaintiffs own evidence suggests that staffing requirements for the Atrium Facilities vary significantly depending on the day of the week. (Lebec Aff. ¶ 6c (criticizing Wherry's proposal for not distinguishing between

days of the week because "each of the [ORs] in which SEA provides services have different usage levels at 11:00 a.m. on a Tuesday versus 11:00 a.m. on a Monday, Wednesday, Thursday or Friday").)

83. The Court, therefore, concludes that Plaintiffs have not demonstrated that the Staffing Formula Outputs have commercial value.

### (2) Difficulty of Duplicating Plaintiffs' Information

84. Defendants argue that Plaintiffs' Staffing Formula Outputs are not trade secrets because they were arrived at using information that is readily available to Atrium and, therefore, Defendants could have independently arrived at a similar staffing model. (Atrium's Br. Opp'n 9; Wherry Defs.' Br. Opp'n 14–15.) In support of their position, the Wherry Defendants point to the fact that Plaintiffs acknowledge that staffing projections can be developed based on clinical logs and hospital data and that Plaintiffs have staffed the Atrium Facilities for years without the use of the Staffing Formula Outputs. (Wherry Defs.' Br. Opp'n 14–15.)

85. Plaintiffs argue that they need not establish that it would be impossible for Defendants to independently develop a similar staffing model, but need only show that Plaintiffs' Staffing Formula Outputs would not be readily ascertainable to them. (Pls.' Br. Supp. 13 (citing *Barr-Mullin, Inc. v. Browning*, 108 N.C. App. 590, 596, 424 S.E.2d 226, 230 (1993)).)

86. Although compilations of data "comprised solely of publicly available information are generally not recognized as trade secrets," such compilations may be entitled to trade secret protection "where the claimant encountered some difficulty in

assembling each of the public components." *Safety Test & Equip. Co.*, 2015 NCBC LEXIS 40, at *26 (first citing *Combs & Assocs.*, 147 N.C. App. at 370–71, 555 S.E.2d at 640; and then citing *SCR-Tech LLC v. Evonik Energy Servs., LLC*, 2011 NCBC LEXIS 27, at *47 (N.C. Super. Ct. July 22, 2011)). "A party must meet a high burden to prove that a compilation or process based on public information is a trade secret." *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *31 (N.C. Super. Ct. Feb. 18, 2016) (citing *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 376, 542 S.E.2d 689, 692 (2001)).

87. Plaintiffs contend that "no other system like the Rooms Running Algorithm, Staffing Calculator, and Staffing [Formula] Outputs exists" and that it would "take years of practicing at *Atrium's* facilities to create similarly workable, safe staffing models." (Pls.' Br. Supp. 13.) Plaintiffs have presented evidence that it took years for Surgical Directions, a Mednax affiliate, to develop the Rooms Running Algorithm and Staffing Calculator, which, in mid-2017, were refined for use in the specific area of anesthesia staffing. (Besedick Aff. ¶¶ 2, 5, 10.) Besedick, an engagement manager for Surgical Directions, testified that "although staffing planners sometimes use similar heatmaps [for medical staffing] . . . [he is] unaware of any computer algorithm, program, or application that produces heatmaps with the same specific staffing probability analysis on an hourly basis[.]" (Besedick Aff. ¶ 9.)

88. While Defendants may well be able to come up with *a* staffing model for the Atrium Facilities, the Court cannot conclude on the record before it that Defendants would be able to arrive at Plaintiffs' Staffing Formula Outputs using information in

Atrium's possession. Accordingly, the Court concludes that Plaintiffs have sufficiently shown that Defendants would not be able to duplicate Plaintiffs' Staffing Formula Outputs with ease.

### (3) Efforts to Guard Secrecy

89. Defendants argue that Plaintiffs' Staffing Formula Outputs are not trade secrets because Plaintiffs did not adequately guard the secrecy of the information by failing to indicate or mark the November 30 Presentation as confidential or trade secret information at the time of the presentation or in a subsequent e-mail transmitting the PowerPoint slides. (Atrium's Br. Opp'n 8; Wherry Defs.' Br. Opp'n 15–16.) The Wherry Defendants further argue that Plaintiffs have not adequately guarded the secrecy of the information because Plaintiffs, knowing that Wherry possessed the PowerPoint, never asked Wherry to return or destroy the file. (Wherry Defs.' Br. Opp'n 15.)

90. Finally, Atrium argues that Plaintiffs failed to adequately guard the secrecy of the information because Plaintiffs provided Atrium, a public entity, with the information without marking it as confidential or trade secret at the time of disclosure, thus making the information subject to public disclosure under the North Carolina Public Records Act and not protectable under the TSPA. (Atrium's Br. Opp'n 8–9.)

91. Plaintiffs argue that they were not obligated to mark or otherwise indicate that the November 30 Presentation was confidential because Atrium was bound by the confidentiality provisions in the SEA Agreements. (Pls.' Reply Br. 3.) Plaintiffs

contend that Atrium was obligated not only to protect Plaintiffs' confidential information but to ensure that Wherry and Total Anesthesia would abide by the provisions, which did not contain any requirement that the information be marked as confidential. (Pls.' Reply Br. 3–4.)

92. While Plaintiffs are correct that information may constitute a trade secret even where it has not been the subject of "absolute secrecy at all times and in all circumstances," *TaiDoc Tech. Corp. v. Biotech Co., Ltd.*, 2016 NCBC LEXIS 26, at *24–25 (N.C. Super. Ct. Mar. 28, 2016), Plaintiffs' argument ignores that the TSPA requires that the claimant seeking trade secret protection take efforts to maintain the information's secrecy "that are reasonable under the circumstances," N.C. Gen. Stat. § 66-152(3)(b). In fulfilling the SEA Agreements over several decades, Plaintiffs and Atrium undoubtedly exchanged a voluminous amount of information. At the hearing on the Motion, Plaintiffs' counsel conceded that some of the information exchanged between Atrium and Plaintiffs throughout their relationship was not confidential. In the absence of appropriate confidentiality designations, Atrium would be left guessing which information provided by Plaintiffs "constitute[d] confidential, proprietary or trade secret information." (Union Agreement § 4.8(a).) Additionally, Plaintiffs gave no indication that they inquired as to whether Wherry was aware of and agreed to be bound by the confidentiality provision or, at any time, requested that Wherry return or destroy the information he received, even after learning that Wherry had formed Scope to assume responsibility for anesthesia services at the Atrium Facilities. At this stage of the proceeding, the Court cannot

conclude that it was reasonable under the circumstances for Plaintiffs to present their Staffing Formula Outputs to Wherry without indicating that the information was confidential or trade secret information.

93.    As to Atrium's argument that the Staffing Formula Outputs are now subject to disclosure under the Public Records Act, Plaintiffs contend that the act "expressly excludes from public disclosure requirements any information '*designated* or indicated' by the parties as confidential" and that Atrium's argument, "taken to its illogical conclusion . . . would require even items such as patient charting information to be stamped." (Pls.' Reply Br. 4 & n.1.)

94.    Neither party disputes that Atrium is a public body subject to the Public Records Act.  The Court, therefore, concludes, consistent with North Carolina law, that Atrium is subject to public records requests.  N.C. Gen. Stat. § 131E-16(14) (defining "hospital authority" as "a public  body and a body corporate and politic"); N.C. Gen. Stat. § 131E-17(a) (providing that a hospital authority may be created by a city council or county board of commissioners); *Jackson v. Charlotte Mecklenburg Hosp. Auth.*, 238 N.C. App. 351, 351–52, 768 S.E.2d 23, 24 (2014) (applying the Public Records Act to CHS where the parties did not dispute that it was a local unit of government subject to the Public Records Act); *Knight Publ'g Co. v. Charlotte-Mecklenburg Hosp. Auth.*, 172 N.C. App. 486, 486–87, 616 S.E.2d 602, 603 (2005) ("The Charlotte–Mecklenburg Hospital Authority d/b/a, Carolinas Healthcare System (defendant) is a 'public body and a body corporate and politic' organized and existing under the Hospital Authorities Act . . . .").

95.     The Public Records Act generally provides the public with "liberal access to public records." *Knight Publ'g Co.*, 172 N.C. App. at 489, 616 S.E.2d at 605.  Public records include "all documents and papers made or received by any agency of North Carolina government in the course of conducting its public proceedings." *Virmani*, 350 N.C. at 462, 515 S.E.2d at 685 (citing N.C.G.S. § 132–1(a)).  "Absent clear statutory exemption or exception, documents falling within the definition of 'public records' in the Public Records Law must be made available for public inspection." *Id.* Further, "[e]xceptions and exemptions to the Public Records Act must be construed narrowly." *Carter-Hubbard Publ'g Co. v. WRMC Hosp. Operating Corp.*, 178 N.C. App. 621, 624, 633 S.E.2d 682, 684 (2006).

96.     The Public Records Act provides that it does not require or authorize a public agency to disclose information where four conditions are satisfied: (1) the information "[c]onstitutes a 'trade secret' as defined in [N.C. Gen. Stat. §] 66-152(3)"; (2) "[i]s the property of a private 'person' as defined in [N.C. Gen. Stat. §] 66-152(2)"; (3) "[i]s disclosed or furnished to the public agency in connection with the owner's performance of a public contract or in connection with a bid, application, [or] proposal"; and (4) "[i]s designated or indicated as 'confidential' or as a 'trade secret' at the time of its initial disclosure to the public agency." N.C. Gen. Stat. § 132-1.2(1).

97.     Plaintiffs' argument that they were not obligated to mark information as confidential because the SEA Agreements contained confidentiality provisions ignores the fact that no part of the November 30 Presentation was "designated or indicated as 'confidential' or as a 'trade secret' *at the time of its initial disclosure*" to

Atrium as required by statute. *Id.* (emphasis added). That the SEA Agreements did not require that information be marked as confidential is of no consequence as the Court is not aware of any provision in the Public Records Act or other legal authority that permits the parties to contractually abrogate a legislative mandate of the General Assembly in this instance. *Cf.* N.C. Gen. Stat. § 57D-2-30(a) (expressly permitting parties to an operating agreement to, within certain limitations, supplant, vary, disclaim, or nullify, the North Carolina Limited Liability Company Act and the common law). Further, Plaintiffs' argument that patient charting information would be subject to public disclosure if not marked as confidential is unavailing as "[m]edical records compiled and maintained by health care facilities in connection with the admission, treatment, and discharge of individual patients are not public records as defined by Chapter 132 of the General Statutes." N.C. Gen. Stat. § 131E-97.

98. Based on the foregoing, the Court concludes, at this early stage of the proceedings, that Plaintiffs have not sustained their initial burden of demonstrating that the Staffing Formula Outputs constitute trade secrets. Accordingly, the Court further concludes that Plaintiffs have not demonstrated a likelihood of success on the merits of their misappropriation of trade secrets claim.

### 2. Actual or Threatened Misappropriation

99. Although the Court has determined that Plaintiffs have not demonstrated a likelihood of success in showing that their information constitutes trade secrets, the Court will nevertheless address the parties' arguments as to misappropriation.

100.    To establish a *prima facie* case of trade secret misappropriation, Plaintiffs "must offer substantial evidence that the defendant '(1) knows or should have known of the trade secret, and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent of the owner.'" *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 658, 670 S.E.2d 321, 329 (2009) (quoting N.C. Gen. Stat. § 66-155). "[S]uch a claim may be proven through circumstantial evidence." *Id.* Once a *prima facie* case is established, a defendant may rebut the showing with substantial evidence that the information was acquired "by independent development, reverse engineering, or it was obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. § 66-155; *Horner Int'l Co.*, 232 N.C. App. at 569, 754 S.E.2d at 859.

101.    Plaintiffs argue that they have demonstrated a likelihood of success on the merits of their misappropriation of trade secrets claim because it is undisputed that Defendants have knowledge of and have acquired Plaintiffs' Staffing Formula Outputs by virtue of their attendance at the November 30 Presentation, Wherry's note taking at the presentation, and Plaintiffs' e-mail transmitting the PowerPoint to Atrium personnel. (Pls.' Br. Supp. 15.) Plaintiffs further argue that Defendants' conduct in presenting Wherry as a consultant and in continuing to negotiate with Plaintiffs even after the Scope Agreement had been signed were part of a scheme to steal Plaintiffs' information and demonstrates bad faith and underhanded dealing. (Pls.' Reply Br. 8–9.) Plaintiffs contend that, even in the absence of evidence of actual or threatened use of Plaintiffs' trade secret information, Defendants, because they

are in possession of Plaintiffs' trade secrets, must be enjoined or they will inevitably use Plaintiffs' information to determine staffing for the Atrium Facilities. Plaintiffs contend Wherry must use this information because he has demonstrated an inability to develop his own workable staffing model for the Atrium Facilities. (Pls.' Br. Supp. 16.) Accordingly, Plaintiffs request that the Court not only enjoin Defendants from using or disclosing Plaintiffs' confidential, proprietary, or trade secret information, but also enjoin Dr. Wherry and Scope from providing anesthesia services at any of the Atrium Facilities. (Pls.' Mot. Prelim. Inj. ¶ 17(1)–(2); Pls.' Br. Supp. 16; Pls.' Reply Br. 7–8.)

102. Defendants counter that Plaintiffs mischaracterize Defendants' conduct as an alleged scheme to obtain Plaintiffs' confidential information, particularly in light of the undisputed fact that Defendants did not request that Plaintiffs present a CRNA-lease proposal. (Atrium's Br. Opp'n 14; Wherry Defs.' Br. Opp'n 17–18.) Defendants also contend that North Carolina courts have declined to adopt the "inevitable disclosure" doctrine advanced by Plaintiffs and, in any event, Plaintiffs have not shown that Defendants will inevitably use Plaintiffs' information as it is of no use to Defendants. (Atrium's Br. Opp'n 15–16; Wherry Defs.' Br. Opp'n 17 n.4.)

103. With regard to Plaintiffs' argument that Defendants will inevitably use Plaintiffs' trade secret information, the Court is aware of only one North Carolina appellate decision that addresses the doctrine of inevitable disclosure. *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 579 S.E.2d 449 (2003). In *Analog*, the Court of Appeals did not reach the issue of whether to adopt the doctrine of inevitable

disclosure because the requested injunction would be overbroad and "act as an absolute barrier to working in [defendant's particular field] without reference" to whether plaintiff's information could be used by defendant in his new employment. *Id.* at 470, 579 S.E.2d at 455. Thereafter, this Court has only addressed the doctrine on limited occasions and has declined to apply the doctrine where invited to do so. *See, e.g, DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, at *15–18 & nn.3–5 (N.C. Super. Ct. May 12, 2015) ("The Court declines to consider whether the doctrine of inevitable disclosure, if adopted in North Carolina, should be applied to these facts."); *Allegis Grp., Inc. v. Zachary Piper, LLC*, 2013 NCBC LEXIS 12, at *27–30 (N.C. Super. Ct. Feb. 25, 2013) (concluding that the Court need not resolve whether the doctrine should apply). In one of those cases, this Court previously noted that federal courts in the Fourth Circuit have given the inevitable disclosure doctrine "at least some recognition," and one decision of the District Court for the Middle District of North Carolina "predicted that the North Carolina state courts will recognize the doctrine in appropriate circumstances." *Allegis Grp., Inc.*, 2013 NCBC LEXIS 12, at *28–29 (citing *Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1459 (M.D.N.C. 1996)).

104. Notwithstanding the federal district court's prediction, which after nearly twenty-two years has still not come to fruition, the Court declines at this time to adopt and apply the inevitable disclosure doctrine, particularly in light of the fact that Plaintiffs have not sufficiently demonstrated that the information obtained by Defendants constitutes protectable trade secrets or that Defendants would

necessarily use it in order to properly staff the Atrium Facilities with anesthesiologists. Notwithstanding the affidavits of Plaintiffs' physicians in which they aver that Wherry cannot safely and properly staff the Atrium Facilities without using Plaintiffs information, Plaintiffs have not demonstrated that it would be impossible for Wherry to devise a workable staffing model for the July 1 start date of the Scope Agreement without the use of Plaintiffs' information.

105. Because Plaintiffs have not established a likelihood of success on the merits of their claim for misappropriation of trade secrets, the Court denies the Motion as to that claim.

### 3. Irreparable Harm

106. Notwithstanding that the Court has concluded that Plaintiffs have neither demonstrated that any of the information disclosed to Defendants constitutes a trade secret nor shown threatened or actual misappropriation of trade secrets, the Court will proceed to analyze the parties' arguments as to whether Plaintiffs are likely to suffer irreparable harm in the absence of an injunction.

107. Plaintiffs argue that North Carolina courts have held that "[m]isappropriation of a trade secret is an injury of 'such continuous and frequent recurrence that no reasonable redress can be had in a court of law.' The very nature of a trade secret mandates that misappropriation will have significant and long-term effects." (Pls.' Br. Supp. 17 (quoting *Barr-Mullin, Inc.*, 108 N.C. App. at 597, 424 S.E.2d at 230).) Plaintiffs contend that, in the absence of an injunction, and as a result of Defendants' misappropriation, its operations in the region will be gutted and

they will lose their competitive business advantage, employees, and patients. (Pls.' Br. Supp. 18.)

108. Atrium argues that Plaintiffs will not suffer an irreparable injury in the absence of an injunction as evidenced by Plaintiffs' failure to file the Motion until May 11, 2018, when it learned on February 1, 2018 that Wherry's new company had contracted to become Atrium's new anesthesia service provider. (Atrium's Br. Opp'n 22–23.) The Wherry Defendants argue that Plaintiffs will not lose patients because the patients were Atrium's, not Plaintiffs. (Wherry Defs.' Br. Opp'n 20.) The Wherry Defendants further argue that Plaintiffs have not demonstrated that they will suffer irreparable harm unless Defendants' conduct is enjoined because Plaintiffs' loss of the SEA Agreements and its operations in the region was the result of Plaintiffs' obstinacy in negotiating with Atrium—not the misappropriation of any trade secrets. (Wherry Defs.' Br. Opp'n 20.)

109. The Court concludes that Plaintiffs' delay between learning on February 1, 2018 that Scope had entered into an agreement to provide anesthesia services at the Atrium Facilities and the filing of the Motion on May 11, 2018, does not demonstrate that Plaintiffs will not suffer irreparable harm in the absence of an injunction. Here, Plaintiffs filed the Complaint on March 26, 2018, approximately fifty days after learning that Wherry would be forming a new entity to provide anesthesia services at the Atrium Facilities. (Compl. 45.) The Complaint itself indicated that Plaintiffs considered the circumstances appropriate to move the Court for injunctive relief. (Compl. 44.) Thereafter, Plaintiffs filed the Motion on May 11, 2018. In light of the

numerous and complex claims alleged in the Complaint and the voluminous record submitted to the Court in connection with the Motion, the Court concludes that Plaintiffs' delay does not demonstrate an absence of irreparable harm.

110. As to the Wherry Defendants' argument that Plaintiffs cannot be harmed by losing patients who were never their patients, the record reveals that staffing of SEA physicians at the Atrium Facilities was driven by Atrium's scheduled surgeries and procedures, and that Plaintiffs' only responsibility in this process was "to provide the appropriate number of anesthesiologists." (Fortune Aff. ¶ 24.) Plaintiffs have presented no evidence that the SEA physicians regularly interacted with patients or developed a professional relationship with patients over time. Accordingly, the Court concludes that the loss of patients is not an irreparable harm that will be suffered by Plaintiffs. *See Great Lakes Anesthesia, P.C. v. O'Bryan*, --- N.E.3d ---, 2018 Ind. App. LEXIS 118, at *12–13 (Ind. App. Ct. Apr. 4, 2018) (affirming trial court's finding that a non-compete agreement between an anesthesiology group and a CRNA was unenforceable, in part, because "patients do not make a choice about medical care on the basis of a CRNA"); *Duneland Emergency Physician's Med. Grp., P.C. v. Brunk*, 723 N.E.2d 963, 966–67 (Ind. Ct. App. 2000) (observing, in the context of the validity of a non-competition provision, that there was no evidence patients select an emergency room based on the physicians working there or that any patients had left plaintiff's emergency room to follow defendant to his new employment); *Premier Health Care Servs. v. Schneiderman*, No. 18795, 2001 Ohio App. LEXIS 5935, at *23–24 (Ohio Ct. App. Dec. 28, 2001) (unpublished) ("Emergency center physicians do not

develop relationships with patients and then upon leaving the practice may [sic] take the patients with them as physicians in typical practices may. Emergency center physicians often only see a patient on one occasion and even then only briefly until the patient is either dismissed or admitted.").

111. The Court further concludes based on the record before it that any irreparable harm that would be suffered by Plaintiffs from the loss of the SEA Agreements, and with them a large portion of Plaintiffs' business, was not the result of any misappropriation of trade secrets.

112. Accordingly, the Court concludes that Plaintiffs have not demonstrated that they are likely to suffer irreparable harm in the absence of an injunction.

### 4. Public Interest

113. As discussed above, Plaintiffs have not demonstrated that they will suffer irreparable harm that warrants an injunction. However, Plaintiffs have argued that an injunction is necessary to protect not only Plaintiffs' interests, but the interests of the public. (Pls.' Br. Supp. 19; Pls.' Reply Br. 11–12.) Accordingly, the Court will address those arguments.

114. First, Plaintiffs argue that Atrium's decision to terminate the SEA Agreements was driven by its desire to switch all Atrium Facilities to a physician-lease model to give Atrium greater control over pricing and billing for anesthesia services. (Pls.' Br. Supp. 19–20; Pls.' Reply Br. 11–12.) Plaintiffs contend that allowing Atrium to assume control over the market for anesthesia services will result in less competition and higher prices. (Pls.' Br. Supp. 19–20.) In support of this

argument, Plaintiffs submitted, under seal, two medical bills for the same procedure—one for services rendered at an Atrium facility operating under the physician-lease model and the other for services rendered at an Atrium facility where SEA billed for services. (Miller Aff. ¶¶ 27–28.) The services billed by Atrium were $22.50 higher, even though the insurance payments were identical. (Miller Aff. ¶ 28.)

115. While Plaintiffs may ultimately be able to present sufficient evidence to succeed on their antitrust claims, Plaintiffs have not argued or shown a likelihood of success on the merits as to those claims. Neither have Plaintiffs presented sufficient evidence for the Court to reach a conclusion as to those claims.

116. Additionally, although Plaintiffs do not argue in their briefs that Wherry will be unable to safely staff the Atrium Facilities beginning on July 1, 2018, Plaintiffs' submissions to this Court and the ad campaign commenced by Plaintiffs are replete with suggestions that Scope, if permitted to become the exclusive anesthesia provider for the Atrium Facilities, will not be able to provide anesthesia services in a safe manner. (Belan Aff. ¶¶ 12d, 21; Lebec Aff. ¶¶ 27, 32; Berger Aff. Exs. C–F.)

117. The Court notes that the provision of anesthesia services is governed by both state and federal regulations designed to ensure the safety of patients. *See, e.g.*, N.C. Gen. Stat. § 90-18.5 (requiring that anesthesiologists assistants be supervised by a licenses anesthesiologist who is "immediately available on-site to provide assistance" and that an anesthesiologist can supervise no more than two anesthesiologist assistants at a time). Accordingly, nothing else appearing, the Court

expects that Scope and Atrium will abide by all applicable laws and regulations in administering patient care. As a result, the Court concludes, based on the factual record before it, that the public interest does not weigh in favor Plaintiffs' request for injunctive relief on their misappropriation of trade secrets claim.

## B.     Violation of Non-Solicitation Agreement

118.    Plaintiffs separately argue that they are entitled to an injunction because they have demonstrated a likelihood of success on the merits of their claim that Atrium breached the SEA Agreements' non-solicitation provisions by attempting to induce Plaintiffs' physicians to leave their employment with Plaintiffs to join Scope and directing Wherry to aid in the effort to poach Plaintiffs' physicians. (Pls.' Br. Supp. 22–24.) Plaintiffs further argue that they will be irreparably harmed if Defendants are not enjoined from soliciting SEA physicians because its physicians are its most valuable asset. (Pls.' Br. Supp. 24–25.)

## A.     Validity of the Non-Solicitation Provisions

119.    "Restrictions prohibiting the inducement of employees are contracts in restraint of trade that the Court must carefully scrutinize for reasonableness." *Sandhills Home Care, L.L.C. v. Companion Home Care – Unimed, Inc.*, 2016 NCBC LEXIS 61, at *35–36 (N.C. Super. Ct. Aug. 1, 2016) (quotation marks omitted); *see also Kennedy v. Kennedy*, 160 N.C. App. 1, 9, 584 S.E.2d 328, 333 (2003) ("Covenants not to compete restrain trade and are scrutinized strictly."). This Court has concluded that the same standards that apply to the interpretation and enforcement of non-competition agreements apply to non-solicitation agreements. *Sandhills Home Care,*

*L.L.C.*, 2016 NCBC LEXIS 61, at \*37. "To be enforceable under North Carolina law, a non-competition agreement must be: (1) in writing; (2) part of an employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest." *Med. Staffing Network, Inc.*, 194 N.C. App. at 655, 670 S.E.2d at 327.

120. Atrium does not challenge the validity of the non-solicitation provisions as to the first four requirements but argues that, because Plaintiffs have been effectively put out of business by the loss of the SEA Agreements, the non-solicitation provisions do not serve any legitimate business interest. (Atrium's Br. Opp'n 17–19.)

121. As an initial matter, Plaintiffs have submitted evidence that the SEA Agreements are not the entirety of their business in the region and, if the Motion is denied, Plaintiffs will continue to employ the SEA physicians for six months to provide services at other facilities with which Plaintiffs have contracts. (Long Aff. ¶ 10.) As a result, the Court disagrees with Atrium's assertion in this regard. Therefore, the Court must determine whether Plaintiffs have a legitimate business interest in retaining the SEA physicians in light of their other, more limited business engagements.

122. Plaintiffs nowhere indicate the specific legitimate business interest that the non-solicitation provisions are designed to serve. (Pls.' Br. Supp. 20–22.) North Carolina cases addressing the business interests served by covenants that prohibit the solicitation of employees generally involve employees who interact and develop relationships with customers or patients. *See, e.g., Sandhills Home Care, L.L.C.*,

2016 NCBC LEXIS, at *24, 36–38. Plaintiffs do not appear to assert that the loss of SEA physicians will result in lost customer or client relationships, but instead appear to argue that it is the retention of the highly skilled anesthesiologists that is the interest to be served by the non-solicitation provisions. (Pls.' Br. Supp. 24–25.) Because there is evidence in the record and support in North Carolina decisions for the proposition that specialized physicians require considerable effort to recruit and train, the Court concludes, at this stage of the proceeding, that the retention of highly-skilled physicians, who Plaintiffs undertook efforts to recruit, credential, and train, is a legitimate business interest of SEA. *Cf. Calhoun v. WHA Med. Clinic, PLLC*, 178 N.C. App. 585, 594, 632 S.E.2d 563, 569 (2006) (evaluating whether the amount of liquidated damages for violation of a non-compete was a reasonable estimate of actual damages and noting that it took plaintiff six months and considerable expense to recruit two replacement cardiologists). Defendants' own submissions before the Court also support the notion that considerable effort is expended in identifying and hiring qualified anesthesiologists. (Atrium's Br. Opp'n 23 (arguing that Defendants should not now be enjoined, in part, because Wherry has expended effort to identify, recruit, and hire highly qualified anesthesiologists).) Accordingly, the Court rejects Atrium's argument that Plaintiffs have no legitimate business interest in retaining their highly trained physicians.

123. Therefore, the Court concludes that Plaintiffs have sufficiently demonstrated that the non-solicitation provisions are valid and enforceable.

## 2. Breach of the Non-Solicitation Provisions

124. Atrium argues that, even if the non-solicitation provisions are otherwise enforceable, Plaintiffs are not likely to succeed in demonstrating that Atrium breached the non-solicitation provisions because the SEA Agreements prohibit Atrium from "actively encouraging a person who is known to be employed by [SEA] to quit their employment with [SEA] and accept employment with the soliciting party." (Atrium's Br. Opp'n 20–21; CMC Agreement § 1.6(b); Union Agreement 1.6(b).) Atrium contends that, because the SEA physicians' employment will end on June 30, 2018 with the termination of the SEA Agreements, solicitation to join Scope beginning on July 1, 2018 would not constitute encouragement to quit their employment with SEA. (Atrium's Br. Opp'n 21–22.)

125. As noted above, Plaintiffs have presented evidence that the SEA physicians will continue their employment with Plaintiffs beyond the expiration of the SEA Agreements. (Long Aff. ¶ 10.) Accordingly, the Court rejects Atrium's argument on this point.

126. Atrium next argues that it has not breached the non-solicitation provision because the physicians at issue were employees of AASE, not SEA, and the SEA Agreements prohibited solicitation of persons known to be employed by SEA. (Atrium's Br. Opp'n 21 n.10.) Similarly, Atrium argues that the agreements only prohibited solicitation of SEA's employees to become employees of Atrium; therefore, any solicitation to become an employee of Scope would not constitute a breach of the non-solicitation provisions. (Atrium's Br. Opp'n 21 n.11.)

127. Atrium's hypertechnical arguments ignore that the SEA Agreements provided that "[SEA] is a private medical practice that employs highly skilled physicians who are licensed and board certified in anesthesiology and related subspecialty services." (Union Agreement 1; CMC Agreement 1.) The SEA Agreements made additional references acknowledging that the parties understood the physicians to be employed by SEA. (*See, e.g.*, Union Agreement § 1.2(b) (referring to the physicians' "employment by or affiliation with [SEA]").) In addition, Atrium's internal memoranda further support the conclusion that Atrium understood the SEA Agreements to prohibit solicitation of the SEA physicians. (Miller Aff. Ex. G.) Atrium's argument that the SEA physicians were not employees of SEA is, therefore, unavailing as the parties clearly understood and intended the non-solicitation provision to prohibit solicitation of Plaintiffs' physicians. *Cf. Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, 228 N.C. App. 613, 627, 747 S.E.2d 256, 266 (2013) ("[T]he goal of [contract] construction is to arrive at the intent of the parties when the [contract] was issued." (alterations in original)).

128. Furthermore, by the SEA Agreements' express terms, Atrium was prohibited from directly, or indirectly through a third party, encouraging the SEA physicians to "accept employment with *the soliciting party*." (*See, e.g.*, Union Agreement § 1.6(b) (emphasis added).) Accordingly, a showing that Wherry, at the direction of Atrium, solicited an SEA physician to leave his or her employment with SEA and accept employment with Scope, would, in the Court's opinion, fall within the non-solicitation provisions' prohibitions.

129. The Court additionally observes that the non-solicitation provision prohibits Atrium from "solicit[ing] or employ[ing] anyone then employed by [SEA]." Although any SEA physicians hired by Scope to work under the Scope Agreement would be an employee of Scope, not Atrium, Atrium has implicitly argued that Scope's employment agreements with physicians also result in Atrium owing contractual commitments to the physicians. (Atrium's Br. Opp'n 23.) Additionally, Atrium would almost certainly be aware that Scope had hired an SEA physician. The SEA Agreements required that the SEA physicians (1) satisfy the requirements and criteria to be appointed to Atrium's medical staff as set forth in the medical staff bylaws, (2) maintain active membership on and remain in good standing with Atrium's medical staff, and (3) apply for and maintain clinical privileges at the Atrium Facility that is subject to the agreement. (Union Agreement § 1.3(c)-(d); CMC Agreement § 1.3(c)-(d).) While the Scope Agreement is not before the Court, it is likely that the agreement would similarly require the Scope physicians to obtain admitting privileges in order to practice at the Atrium Facilities. Pursuant to statute, hospitals must determine whether to grant a physician admitting privileges "based upon the applicant's education, training, experience, demonstrated competence and ability, and judgment and character of the applicant, and the reasonable objectives and regulations of the hospital." N.C. Gen. Stat. § 131E-85. Accordingly, Atrium would likely be aware of who Scope had hired as physicians and whether their past experience included employment by SEA.

130. The Wherry Defendants separately argue that, because they are not parties to the SEA Agreements, they were not bound by its provisions and cannot be in breach thereof. (Wherry Defs.' Br. Opp'n 22.) The Wherry Defendants are correct that, ordinarily, a non-party to a contract cannot be bound by the contract's terms. *Barrow v. Murphrey*, 95 N.C. App. 738, 741, 383 S.E.2d 684, 686 (1989) ("It is a fundamental principal of contract law that parties to a contract may bind only themselves and . . . may not bind a third person who is not a party to the contract in absence of his consent to be bound." (emphasis omitted)). However, our Supreme Court has previously held that a non-party to a contract containing an enforceable covenant not to compete may be jointly liable with a party who breaches the covenant if the non-party knows of the covenant's existence and conspires with the breaching party to cause the breach. *Harwell Enters., Inc. v. Heim*, 276 N.C. 475, 479, 173 S.E.2d 316, 319 (1970); *see also HSG, LLC v. Edge-Works Mfg. Co.*, 2015 NCBC LEXIS 91, at *10–12 (N.C. Super. Ct. Oct. 5, 2015) (denying dismissal of a claim that defendant, a non-party to a contract containing a restrictive covenant, was liable for breach of the covenant where plaintiff alleged that the non-party knew of the covenant and acted in concert with the breaching party to violate the provision). Additionally, Rule 65(d) permits the Court to enter an injunction that "is binding . . . upon the parties to the action, their officers, agents, servants, employees, and attorneys, *and upon those persons in active concert or participation with them who receive actual notice in any manner* of the order by personal service or otherwise." N.C. Gen. Stat. § 1A-1, Rule 65(d) (emphasis added).

131. Plaintiffs have presented evidence that Blanchfield, a management-level employee of Atrium, engaged in conversations with Buhrman, an SEA physician, about the termination of the SEA Agreements and the possibility that Buhrman could continue providing anesthesia services at Atrium after June 30, 2018. (Buhrman Aff. ¶¶ 13, 15.) Plaintiffs have also presented evidence that Blanchfield was involved in setting up communications between Buhrman and Wherry, the culmination of which resulted in Wherry offering Buhrman employment with Scope. (Buhrman Reply Aff. Ex. A; Buhrman Aff. ¶ 17.) Plaintiffs further presented evidence that Wherry was aware of the non-solicitation provisions, indicated he intended to take legal action to have the physicians' non-competition agreements declared invalid, and offered to pay Buhrman six months' salary in the event he were unable to work as a result of his attempt to join Scope. (Buhrman Aff. ¶ 14.) Wherry does not dispute Plaintiffs' evidence, but instead avers that "Scope has no offers of employment outstanding" with and "no plans to hire" any of Plaintiffs' physicians. (Wherry Aff. ¶ 39.)

132. Based on the foregoing, the Court concludes, at this stage of the proceedings and based on the record before the Court and arguments of counsel, that Plaintiffs have demonstrated a likelihood of success on the merits of their claim that Atrium, acting in concert with Wherry, violated the non-solicitation provision by attempting to induce Buhrman to leave his employment with SEA and join Scope to provide anesthesia services at the Atrium Facilities.

### 3. Irreparable Harm and Balancing of the Equities

133. Plaintiffs argue that unless Defendants are enjoined from soliciting the SEA physicians, Plaintiffs will be irreparably harmed by the loss of their most valuable resource. (Pls.' Br. Supp. 25.) As the Court previously concluded that Plaintiffs have a legitimate interest in retaining the SEA physicians, the Court similarly concludes that Plaintiffs have demonstrated that the loss of SEA physicians would constitute irreparable harm. As noted above, Atrium's own brief implicitly acknowledges the effort required to acquire highly qualified anesthesiologists by arguing that it would be inequitable to enjoin Scope from providing anesthesia services at the Atrium facilities after Scope has undertaken the effort "to identify, recruit, and hire" physicians. (Atrium's Br. Opp'n 23.)

134. Conversely, Defendants have presented evidence that they neither intend to solicit or hire any SEA physicians nor need the SEA physicians for Scope to be able to provide anesthesia services at the Atrium Facilities beginning on July 1, 2018. (Wherry Aff. ¶¶ 38–39.) The Court, therefore, concludes that Defendants would not be harmed by an injunction prohibiting them from soliciting SEA physicians.

135. Based on the foregoing, the Court concludes that the harm that Plaintiffs would suffer in the absence of an injunction prohibiting solicitation outweighs the harm that Defendants would suffer should an injunction issue.

136. Having concluded that Plaintiffs have demonstrated a likelihood of success on the merits and that Plaintiffs would suffer irreparable harm in the absence of an injunction, the Court further concludes that Plaintiffs are entitled to a preliminary

injunction enjoining Defendants from soliciting the SEA physicians in violation of the SEA Agreements' non-solicitation provisions. Although Plaintiffs have presented evidence of only one instance where Defendants have arguably violated the non-solicitation provision, the Court concludes that the threat that Defendants will again violate the provision has not dissipated and that an injunction is necessary to protect Plaintiffs' rights during the pendency of the action.

### 4. Unclean Hands

137. Atrium argues that, under the doctrine of unclean hands, Plaintiffs are not entitled to injunctive relief because they have commenced "an intentionally false and misleading public relations campaign to exert pressure on Atrium to return to the bargaining table" and has disparaged Scope's anesthesiologists in violation of medical ethics rules." (Atrium's Br. Opp'n 22.) Plaintiffs argue that the ad campaigns (both their own and Atrium's) are irrelevant to the doctrine of unclean hands because the ads were published after the dispute arose and are, therefore, collateral matters. (Pls.' Reply Br. 12–13.)

138. "Our courts have long recognized that a party seeking equitable relief, such as injunctive relief, must come before the court with 'clean hands.' Those who seek equitable remedies must do equity, and this maxim is not a precept for moral observance, but an enforceable rule." *Kennedy*, 160 N.C. App. at 15, 584 S.E.2d at 328. The doctrine of unclean hands "denies equitable relief only to litigants who have acted in bad faith, or whose conduct has been dishonest, deceitful, fraudulent, unfair, or overreaching in regard to the transaction in controversy." *Brissett v. First Mount*

*Vernon Indus. Loan Ass'n*, 233 N.C. App. 241, 255, 756 S.E.2d 798, 809 (2014). However, "[r]elief is not to be denied because of general iniquitous conduct on the part of the complainant[.]" *Ray v. Norris*, 78 N.C. App. 379, 384, 337 S.E.2d 137, 141 (1985). "The maxim applies to the conduct of a party with regard to the specific matter before the court as to which the party seeks equitable relief and does not extend to that party's general character." *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 619, 730 S.E.2d 763, 766 (2012). Additionally, "[t]he doctrine . . . is only available to a party who was injured by the alleged wrongful conduct." *Id.* (quotation marks omitted).

139. The Court disagrees with Plaintiffs' characterization of its ad campaign as collateral to the dispute before the Court. That Defendants have presented evidence that Plaintiffs directed part of its ad campaign at Scope's job postings made to attempt to locate anesthesiologists is but one example of how Plaintiffs' conduct is directly connected to the dispute regarding the non-solicitation provisions. (Berger Aff. Exs. E-2, G-1.) Further, Atrium has asserted a counterclaim against Plaintiffs for defamation alleging that it was harmed by Plaintiffs' ad campaign. (Am. Answer & Countercls. of Charlotte-Mecklenburg Hosp. Auth. ¶¶ 95–105, ECF No. 14.) However, Atrium did not submit any materials or present any argument in opposition to the Motion that demonstrate any injury it has suffered as a result of Plaintiffs' ad campaign.

140. Accordingly, the Court concludes, in its discretion and on the record before it, that Atrium has not sufficiently demonstrated that the doctrine of unclean hands

warrants a denial of equitable relief, at least as it relates to solicitation of SEA physicians. *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2018 NCBC LEXIS 56, at *30–31 (N.C. Super. Ct. June 5, 2018) ("[T]rial courts are given great discretion to grant, deny, and shape equitable relief," which is "normally invoked by considering an equitable defense, such as unclean hands or laches[.]")

### 5. Laches

141. Atrium also argues that Plaintiffs are not entitled to equitable relief as to their claim for breach of the non-solicitation provision because Plaintiffs have unduly delayed in seeking injunctive relief such that Atrium would be prejudiced by the grant of an injunction. (Atrium's Br. Opp'n 22–23.)

142. Plaintiffs argue that they filed the Motion within ten days of learning that Wherry had solicited Buhrman and, therefore, application of the laches doctrine would be unwarranted. (Pls.' Reply Br. 13 n.8.)

143. "The doctrine of laches is designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Stratton v. Royal Bank of Canada*, 211 N.C. App. 78, 88–89, 712 S.E.2d 221, 230 (2011). Whether the claimant's delay in seeking equitable relief constitutes laches "depends upon the facts and circumstances of each case[.]" *Farley v. Holler*, 185 N.C. App. 130, 647 S.E.2d 675 (2007). However, the mere passage of time is insufficient to establish laches. *MMR Holdings, LLC v. City of Charlotte*, 148 N.C. App. 208, 209, 558 S.E.2d 197, 198 (2001).

144. Rather "the doctrine applies where a delay of time has resulted in some change in the condition of the property or in the relations of the parties." *Id.* "[F]or the doctrine of laches to be sustained, the delay must be shown to be unreasonable and must have worked to the disadvantage, injury or prejudice of the person seeking to invoke it." *Wells Fargo Bank, N.A. v. Coleman*, 239 N.C. App. 239, 247, 768 S.E.2d 604, 610 (2015). Additionally, "the defense of laches will only work as a bar when the claimant knew of the existence of the grounds for the claim." *MMR Holdings, LLC*, 148 N.C. App. at 210, 558 S.E.2d at 198.

145. Although Plaintiffs allege in the Complaint, which was filed on March 26, 2018, that Wherry, acting as an agent of the other Defendants, solicited the SEA physicians by encouraging them to contact him through their attorneys for employment, the allegation was made upon information and belief. (Compl. ¶ 105.) Plaintiffs' briefs and supporting materials present evidence that Wherry did not contact Buhrman directly until April 13, 2018, and thereafter made an offer of employment on May 2, 2018—nine days before Plaintiffs filed the Motion. (Buhrman Aff. ¶¶ 14, 17.) The Court cannot conclude on the facts before it that Plaintiffs' delay was unreasonable.

146. Further, Atrium's argument that it has changed its position during the intervening period between when Plaintiffs learned of the violation of the non-solicitation provision and filed the Motion is tenuous at best. The record before the Court reveals that Wherry, on behalf of Scope, has undertaken efforts to recruit and hire anesthesiologists to fulfill the Scope Agreement and that Scope has entered

contracts with those physicians. (Wherry Aff. ¶ 38.) Although it may be that the Scope Agreement obligates Atrium to utilize the services of those physicians and that Atrium may be liable for breach of the agreement, the Scope Agreement is not before the Court. The Court cannot, therefore, determine that Atrium has been disadvantaged, injured, or prejudiced by Plaintiffs' delay in seeking an injunction.

147. Accordingly, the Court concludes, in its discretion and on the record before it, that Atrium has not demonstrated that laches should bar Plaintiffs' claim for a preliminary injunction.

## IV. CONCLUSION

148. After careful consideration of the briefs, affidavits, and arguments of counsel, the Court concludes, on the record before it at this preliminary stage of the proceeding, that (1) Plaintiffs have not demonstrated a likelihood of success on the merits of their claim for misappropriation of trade secrets and (2) Plaintiffs have demonstrated a likelihood of success on the merits of their breach of contract claim and would suffer irreparable injury in the absence of an injunction.

149. THEREFORE, the Court, in its discretion, GRANTS in part and DENIES in part the Motion as follows:

A. The Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits of their claim that Atrium, with the assistance of Wherry, breached the SEA Agreements' non-solicitation provisions and have made a sufficient showing that they will suffer irreparable harm if Defendants are not enjoined.

Therefore, the Court concludes that Plaintiffs are entitled to a preliminary injunction.

B.     Defendants, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them are enjoined during the course of this litigation and until the expiration of the non-solicitation provisions on July 2, 2019 from directly, or through another, violating the non-solicitation provisions contained in the SEA Agreements by (1) soliciting, encouraging, or otherwise enticing Plaintiffs' physicians or other employees to quit their employment with Plaintiffs and accept employment with Atrium, Scope, or any other entity owned or controlled by Defendants and (2) employing any SEA physician without the express consent of Plaintiffs.

C.     Because the Court has concluded that Plaintiffs have not demonstrated that the information disclosed to Defendants constitutes trade secrets or that threatened or actual misappropriation is likely to occur, the Court further concludes that Plaintiffs have not demonstrated a likelihood of success on the merits of their misappropriation of trade secrets claim or that Plaintiffs are likely to suffer irreparable harm in the absence of an injunction. Therefore, the Motion is denied to the extent Plaintiffs seek

injunctive relief as to their claim for misappropriation of trade secrets.

D.   The Court in its discretion and pursuant to Rule 65(c) determines that Plaintiffs should be required to post a bond with the Mecklenburg County Clerk of Superior Court within two business days of the entry of this Order in the amount of $50,000.00 to secure the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained by this Order.

E.   Except as expressly provided herein, all other relief sought in the Motion is denied.

SO ORDERED, this the 22nd day of June, 2018.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases